IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DANIEL ORME,                              )
                                          )
           Plaintiff,                     )   Case No. CV07-859-HU
                                          )
      vs.                                 )
                                          )   FINDINGS AND RECOMMENDATION
BURLINGTON COAT FACTORY OF OREGON,        )
LLC; BURLINGTON COAT FACTORY OF           )
WASHINGTON, LLC; and BURLINGTON           )
COAT FACTORY WAREHOUSE OF PORTLAND,       )
INC.,                                     )
                                          )
           Defendants.                    )
_____ )

Benjamin Rosenthal
1023 S.W. Yamhill Street, Suite 200
Portland, Oregon 97205
     Attorney for plaintiff

Clarence Belnavis
Jennifer Nelson
Fisher & Phillips
111 S.W. Fifth Avenue, Suite 1250
Portland, Oregon 97204
     Attorneys for defendants

HUBEL, Magistrate Judge:

     Plaintiff Daniel Orme brings this action against his former

employer, Burlington Coat Factory, and related entities

(collectively, Burlington), asserting claims for retaliation under

FINDINGS AND RECOMMENDATION Page 1

42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and Or. Rev. Stat. § 659A.030. Burlington moves for summary judgment.

## Facts

Mr. Orme was employed by Burlington from March 3, 2006 to April 20, 2006 at its Jantzen Beach store, as a customer service representative in the linens department (Linens). Complaint ¶ 3; Declaration of Jennifer Nelson, Exhibit 1, Orme deposition (Orme dep.) 13:3-6; 13:11-13; 13:16-20. Dana Bennett was the district manager who oversaw the operations of the store and Jim Kidd was the store manager. Id. at 14:12-16, 14:09-11. Cecil Cornette managed the cashiers and the "front end" of the store and acted as assistant store manager. Id. at 14:16-24; 17:22-23.

Mr. Orme's primary job responsibilities were to assist customers and clean up after them. Id. at 25:03-15. The process of returning merchandise or other store items to their proper places is called "recovery." Id. at 26:15-28:03. During the time that Mr. Orme worked for Burlington, Linens lacked a manager. Id. at 16:17-18, 16:23. Dorothy Jacobson was the manager of the women's department, which was located next to Linens. Id. at 32:3-10. It was not uncommon for her to walk past Linens. Id. at 40:6-7.

On April 14, 2006, Mr. Orme worked in Linens until closing time. Id. at 34:17-23. After the store closed, but before employees were released to go home, Mr. Orme left Linens to go to the restroom, then stopped in the doorway of the break room to watch a basketball game. Id. at 34:20-35:1. Mr. Orme has testified that he

FINDINGS AND RECOMMENDATION Page 2

1  was there for approximately one minute. Id. at 44:18-24. Ms.
2  Jacobson saw him and told him to get back to his department; Mr.
3  Orme has testified that she was yelling at him, and he ignored her.
4  Id. at 35:2-6. As Mr. Orme was walking back toward Linens, he heard
5  her say, "You people don't know how to do your job," and either
6  "You don't know how to do your fucking job," or "You need to do
7  your fucking job." Id. at 35:7-16. Mr. Orme testified that he was
8  shocked, id. at 35:12, and asked Ms. Jacobson, "Did you verbally
9  assault me?" and she agreed she did while laughing. Id. at 35:17-
10 20.

11      Mr. Orme returned to Linens, but testified that he was
12 "enraged." Id. at 35:21-24, 40:22-25. He then went to see Mr.
13 Cornette, as Mr. Kidd was not working that night. Id. at 35:22-
14 36:01. Mr. Orme told Mr. Cornette that he had been verbally
15 assaulted by Ms. Jacobson, that Ms. Jacobson had used a "racial
16 slur," and that he needed to go home to "avoid further
17 altercations." Id. at 36:7-9. Ms. Jacobson, who had come in right
18 behind Mr. Orme, responded that Linens was not clean and that Mr.
19 Orme could not leave. Id. at 36:6-12. Mr. Orme repeated that he
20 wanted to leave because of Ms. Jacobson's statement. Id. at 36:13-
21 15. Soon afterward, Mr. Orme was allowed to leave. Id. at 36:22-24.

22      At the time Ms. Jacobson encountered Mr. Orme at the break
23 room, he was not on an official break, but Burlington allows
24 restroom breaks outside of official breaks. Rosenthal Declaration,
25 Exhibit JK, deposition of James Kidd (Kidd dep.) 113:18-21. Mr.
26 Orme testified that he did not tell anyone in his department when
27
28 FINDINGS AND RECOMMENDATION Page 3

1   he went to the restroom because there was no one to tell. Orme dep.
2   45:11-13.

3       The next day, Mr. Orme told Mr. Kidd he needed to speak to him
4   about the April 14,2006 incident with Ms. Jacobson. Orme dep.
5   53:14-17, 22-24. Mr. Kidd met with Mr. Orme about noon. Id. at
6   54:3-5. Mr. Orme related his version of the events and asked for
7   and received the telephone number for Mr. Bennett so that he could
8   discuss the April 14 incident with Mr. Bennett. Id. at 54:6-14. Mr.
9   Kidd told Mr. Orme that Burlington would investigate. Id. at 54:6-
10  14; 55:11-15; 55:22-24. At his next break, Mr. Orme called Mr.
11  Bennett and left a message. Id. at 54:15-22.

12      Mr. Kidd also telephoned Mr. Bennett, to tell him about the
13  April 14 incident. Declaration of Dana Bennett ¶ 5. Mr. Bennett
14  states in his declaration, dated June 5, 2008, that "[t]hrough Mr.
15  Kidd, [Burlington] began an investigation and interviewed and/or
16  received statements from five employees, including potential
17  witnesses Victoria Vanderev, Koang Chuol, Cecil Cornette, Paul
18  Higley, and Dorothy Jacobson." Id. at ¶ 6.

19      Mr. Kidd testified that when Mr. Orme first made his
20  complaint, "[r]acism didn't really pop its head up. It was
21  primarily the disrespectful tone of Dorothy's comment to him and
22  her cursing." Kidd dep. 77:21-25. But Mr. Bennett testified at his
23  deposition that the issue of whether the "you people" reference was
24  racially discriminatory was discussed between himself and Mr. Kidd
25  on or before April 20. Bennett dep. 106:15-19.
26  ///

27

28  FINDINGS AND RECOMMENDATION Page 4

1  According to Mr. Kidd, there was "a lot of investigating from
2  his complaint and then from Dorothy's. And it was a time-consuming
3  ordeal. It was on a weekend, and I needed to consummate as much of
4  the facts as I could from those that were involved." Kidd dep.
5  81:21-82:1.[1]

6  While being interviewed by Mr. Kidd in connection with Mr.
7  Orme's complaint against her, Ms. Jacobson complained about Mr.
8  Orme's arguing with her about whether Linens was recovered at the
9  time she made her "you people" comment. Kidd dep. 54:1-6. In
10  response to Ms. Jacobson's complaint about Mr. Orme, Mr. Kidd
11  prepared a reprimand, designated a "final warning" for Mr. Orme.

12  On April 20, 2006, Mr. Bennett went to the store, and he and
13  Mr. Kidd had a meeting with Mr. Orme. Mr. Kidd testified that
14  before meeting with Mr. Orme, he and Mr. Bennett went over the
15  documents he had compiled, "what I had investigated and found out
16  to that point. And I'm not sure exactly everything that I had at
17  that point." Kidd dep. 162:23-163:2.[2] Mr. Bennett and Mr. Kidd

18

19  [1] Mr. Kidd's investigation of Mr. Orme's complaint consisted
20  of interviewing Dorothy Jacobson and two other people, Victoria
    Vanderev and Koang Chuol. Koang said he heard nothing, but some
    yelling, but did not stop to listen to what was said; Vanderev
21  said she heard part of the conversation and only remembered that
    Ms. Jacobson was telling Mr. Orme to do his work and that Mr.
22  Orme was talking about her disrespecting him. Paul Higley was not
    present that night; his input was limited to the comment that
23  Linens was not clean when he got there the next day. There is no
    indication that Cecil Cornette was interviewed or had any
24  knowledge of what had happened except for what Mr. Orme told him.
25  No other witnesses are named in the record. See Kidd Declaration,
    Exhibit 1.

26
    [2] As discussed below, Mr. Bennett testified that he never
27  saw any documentation before the April 20, 2006 meeting.

28  FINDINGS AND RECOMMENDATION Page 5

1   interviewed Mr. Orme to get his version of the April 14, 2006

2   incident. Bennett Declaration ¶ 7. Mr. Bennett says that after

3          listening to plaintiff's version of the incident, I
           indicated to Mr. Orme that statements taken from Ms.
4          Jacobson and other employees witnessing the incident did
           not corroborate his version of events, but instead
5          supported Ms. Jacobson's version that Mr. Orme's
           department was not clean, no racially motivated comment
6          was made, Mr. Orme was caught on an unauthorized break
           watching television at closing, and Mr. Orme was verbally
7          abusive/insubordinate to Ms. Jacobson when she confronted
           him.

8
   Id. However, at his deposition, four months before the declaration,
9
   Mr. Bennett testified that he did not know whether he had any
10
   information that would indicate that Mr. Orme's complaint was not
11
   made in good faith, Bennett dep. 93:1-14, and that he did not know
12
   what the "conflicting story" was. Id. at 95:17-18. At his
13
   deposition, Mr. Bennett had no recollection of Ms. Jacobson's side
14
   of the story. Id. at 128:11-22. Despite the statement in his
15
   declaration that Burlington had obtained a statement from Paul
16
   Higley, Bennett testified at his deposition that he had never seen
17
   Mr. Higley's statement before his deposition and did not know who
18
   asked Mr. Higley to prepare it. Id. 129:2-6. At least on the basis
19
   of the record before the court, the only person who contradicted
20
   Mr. Orme's version of events was Ms. Jacobson.
21
          Mr. Bennett's deposition testimony is internally inconsistent
22
   and disclaims much of Mr. Kidd's testimony. He testified that Mr.
23
   Kidd contacted him to say that Mr. Orme had come to him about an
24
   "incident on a closing shift," and that Mr. Orme was "very upset."
25
   Id. at 17:16-25. Then he testified that he did not remember what
26
   Mr. Kidd said when he contacted Mr. Bennett about the situation
27

28   FINDINGS AND RECOMMENDATION Page 6

1  with Mr. Orme, or what he himself said to Mr. Kidd. <u>Id.</u> at 89:23-

2  90:11. He testified that he did not, before the April 20 meeting,

3  know what Mr. Orme's complaint was. <u>Id.</u> at 45:12-15; 46:15-16. He

4  did not remember receiving the "final warning" to Mr. Orme that Mr.

5  Kidd prepared before the April 20 meeting. <u>Id.</u> at 46:20-47:11. Mr.

6  Bennett testified that prior to the meeting on April 20, he was not

7  aware that Ms. Jacobson had complained about Mr. Orme. <u>Id.</u> at 47:7-

8  10.

9      He did not remember what he told Mr. Orme on April 20, 2006,

10 or what Mr. Orme said. <u>Id.</u> at 91:2-21. He had no recollection of

11 ever asking Mr. Orme for documentation of his complaint or of

12 "asking him for anything." <u>Id.</u> at 47:20-22. He did not know what

13 kind of action Burlington would take to deter discrimination. <u>Id.</u>

14 at 61:17-64:7.

15     Mr. Bennett recalled that Mr. Kidd had told him Mr. Orme

16 complained to him about Ms. Jacobson's use of the words, "you

17 people," <u>id.</u> at 89:13-18,[3] and the possibility of race

18 discrimination, <u>id.</u> at 106:15-19, but said he did not remember

19 whether Mr. Orme said, at the April 20 meeting, that Ms. Jacobson

20 made a racial comment by referring to "you people." <u>Id.</u> 90:2-6. In

21 fact, he did not recall whether the reference to "you people" was

22 even discussed at the April 20 meeting, <u>id.</u> at 91:14-22, although

23 he did testify that he would have been "concerned" if Mr. Orme had

24

25     [3] Although Kidd testified that as of April 19, he did not

26 "seriously think, and there was nothing related to me, that it
   was a quote racist--racism situation." Kidd dep. 101:13-20. See

27 also 175:20-22.

28 FINDINGS AND RECOMMENDATION Page 7

brought it up. Id. at 93:17-94:7. Later in his deposition, Mr. Bennett remembered that at the April 20 meeting, Mr. Orme brought up the question of Ms. Jacobson referring to "you people." Id. at 105:15-17.

Mr. Bennett testified that he had "no idea" whether there was any evidence to suggest that Mr. Orme's complaint was not made in good faith. Id. at 92:17-25; 93:1-14. Mr. Bennett repeated that he had "no idea" whether Mr. Orme truly believed Ms. Jacobson had been disrespectful toward him with a racial comment when she said "you people." Id. at 93:25-94:13. Mr. Bennett did not recall how he responded to Mr. Orme at the meeting. Id. at 90:10-11; 94:14-95:3. He did not remember telling Mr. Orme that his conversations with Ms. Jacobson would be of no concern to Mr. Orme, although he thought it sounded reasonable. Id. 94:14-23. He did not recall reviewing any documents before the April 20 meeting. Id. at 94:24-95:18.

Mr. Bennett initially testified that he had no specific recollection of whether Mr. Orme did or did not say that he could not work with someone who had been disrespectful to him. Id. at 89:5-12. He did not recall touching on the issue of whether Mr. Orme would or would not take leadership or direction from Ms. Jacobson at the April 20 meeting. Id. at 97:20-98:5. However, later in the deposition, he recalled that Mr. Orme told him he was not going to follow Ms. Jacobson's direction, and that Mr. Bennett said, "Well, I guess you leave me no other option, and I guess you're giving me your resignation," to which Mr. Orme responded

FINDINGS AND RECOMMENDATION Page 8

"Yes, I guess I am." Id. at 99:15-100:2.

Mr. Bennett subsequently changed his testimony to say that Mr. Orme told him, "I can't work for Dorothy any longer," and that Mr. Bennett responded, "Well... you're not leaving us many options. So, if you can't follow direction, then you're going to have to--you know, you're going to have to be able to have that separation and have that discussion and follow the leadership of Dorothy as well as the other managers in the store." Id. at 110:19-111:5.[4] Mr. Bennett then clarified that he didn't know if he used the words "no option." Id. at 100:3-5. Then he repeated that he had no recollection of Mr. Orme saying he could not work with someone like Dorothy. Id. 100:16-18. He did not recall who first used the word "resignation." Id. at 98:6-10. However, he recalled Mr. Orme saying, "Yeah, I guess I am," though these words do not appear in Mr. Kidd's summary. Id. at 98:15-24.

Mr. Bennett subsequently revised his recollection further, remembering that Mr. Orme said, "I'm not going to listen to Dorothy." Id. at 112:14-16. See also id. at 110:19-111:5.

Despite saying initially that he did not remember anything about the April 20 meeting, later in the deposition Mr. Bennett recalled that he told Mr. Orme he was at the April 20 meeting to listen to all sides of the stories, that he wanted to get to the bottom of it, and find out what really happened so that Burlington could be fair in its decision, and that he was going to talk with

---

[4] Although Mr. Bennett then confirmed that Ms. Jacobson was not a supervisor. Id. at 111:25-112:1.

FINDINGS AND RECOMMENDATION Page 9

1  Mr. Orme, with Dorothy Jacobson, and with any other witnesses. Id.
2  at 105:7-13, 105:25-106:6, 107:1-6, 109:8-14. He then remembered
3  that Mr. Orme started "attacking Dorothy" and not listening to him
4  "as far as what my take on" the use of the words "you people" was.
5  Id. at 109:15-23. Mr. Bennett did not recall reviewing any
6  investigatory documents before the April 20 meeting. Id. at 94:24-
7  95:6, 109:1-3. Despite the promise to get to the bottom of the
8  situation, he did not talk to or meet with anyone except Mr. Kidd
9  and Mr. Orme on April 20, 2006. Id. at 105:1-7. Mr. Bennett then
10 testified that he did not know whether he told Mr. Orme action
11 would be taken if his discrimination allegations were true. Id.
12 110:3-8. He never reviewed Mr. Kidd's documentation of the April
13 20, 2006 meeting for accuracy; he read it for the first time the
14 morning of the deposition. Id. at 110:9-13.

15      According to Mr. Orme, when he came into Mr. Bennett's office,
16 Mr. Bennett asked him what happened. Orme dep. 61:16-17. Mr. Orme
17 told Mr. Bennett that Ms. Jacobson "verbally and racially assaulted
18 me," saying "you people don't know how to do your job" and that he
19 needed to "do his fucking job." Id. at 61:10-12, 61:21-24.
20 According to Mr. Orme's testimony, Mr. Bennett's response was that
21 Burlington had obtained a statement from Ms. Jacobson and someone
22 else "saying it was the other way around." Id. at 62:13-17. Mr.
23 Orme responded that it was "fine" if they were taking Ms.
24 Jacobson's side over his, but that she "racially assaulted me and
25 I was wondering if anything was going to happen to Dorothy." Id. at
26 62:18-21. Mr. Orme testified that Mr. Bennett told him they were

27

28 FINDINGS AND RECOMMENDATION Page 10

1 "doing their best," but that "pretty much nothing would happen to
2 Dorothy," id. at 62:22-24, because Burlington was not going to
3 discipline Ms. Jacobson. Id. at 64:13-14, 65:10-18. Mr. Orme's
4 understanding was that Mr. Bennett did not believe his version of
5 events. Id. at 63:21-14, 64:2-4.

6     Mr. Orme denies refusing to work with or take direction from
7 Ms. Jacobson, testifying that he said only that he felt
8 uncomfortable working with someone who racially assaulted him. Id.
9 at 64:18-25, 65:1-6.

10     Mr. Orme testified that Mr. Bennett told him, "We're going to
11 have to let you go." Id. at 68:5-6. According to Mr. Orme, Mr.
12 Bennett did not say that if Mr. Orme refused to work with Ms.
13 Jacobson, Burlington would accept his resignation. Id. at 68:7-11.

14     Mr. Kidd testified that he received Ms. Jacobson's version of
15 events on April 15, 2006, and that he decided to reprimand Mr. Orme
16 when he "got all of the documentation compiled." Kidd dep. 78:18-
17 79:2.

18     Mr. Kidd testified at his deposition that he took notes of his
19 interviews, but did not keep the notes, instead transferring what
20 was on his notes to the reprimands he wrote out, Exhibits 7 and 8
21 of the Rosenthal Declaration. Kidd dep. 79:21-81:1.[5] However, with

22 ──────────────────────

23     [5]    The testimony is:
    Q:   So at what point had you decided to discipline Mr. Orme
24            for what occurred on the 14th?
    A:   Once I had all the information compiled from my--my
25            notes.
    Q:   And--
26     A:   And I transferred them onto the documentation from
           Dorothy's complaint.
27     Q:   And we're talking about-when you say your notes, we're

28 FINDINGS AND RECOMMENDATION Page 11

1  its reply materials, Burlington filed some handwritten notes along
2  with a declaration from Mr. Kidd, in which Mr. Kidd states that
3  attached to his declaration are "true and accurate copies of
4  witness statements and notes from witness interviews that I
5  conducted in reference to the April 14, 2006 altercation." Kidd
6  Declaration ¶ 6. Mr. Kidd does not say whether the notes and
7  statements were created at the time of the investigation or for
8  purposes of this litigation.

9      When Mr. Orme came into the meeting with him and Dana Bennett,
10  Mr. Kidd had a disciplinary document prepared. Id. at 79:6-20,
11  Rosenthal Declaration, Exhibit 8.  The document states that it is
12  a "final written warning" for "insubordination." Under the heading
13  "Nature of Violation," Mr. Kidd wrote as follows:

14  _____

15          talking about documents other than these documents
             (i.e., Exhibits 7 and 8)?
16      A:   All of these notes (indicating), okay, that I took, the
             documentation, were summarized primarily on this form
17           right here (indicating). That's what I usually do.
18      Q:   (By Burlington's counsel, Mr. Belnavis) "This form"
             being Exhibit 8.
19      A:   Yeah.
        Q:   And what I'm asking you, though, is if--these other
20           documents, we don't have. You said these were scraps of
             paper that you threw out.
21      A:   I told you that I probably had scraps of paper. I take
             my notes every day. I'm running a store.
22      Q:   Right. I understand that.
        A:   Okay. And in between being interrupted numerous times,
23           I do jot down notes. And I'm probably the only one that
             can read my notes. And then I will go ahead and reenter
24           them from my notes--okay?
25      Q:   Right. Right.
        A:   --on the document that everybody else--
26      Q:   And we don't have those original notes?
        A:   No. No.
27

28  FINDINGS AND RECOMMENDATION Page 12

> Friday evening 4/14 9:15 (approx. time) Dorothy Jacobson
> Dept. Mgr. Sportswear was supervising recovery of the
> store when she encountered Daniel in the Associates'
> Lounge watching a Basketball game. When Dorothy informed
> Daniel he needed to get back to his dept. & do his job -
> He he argued w/ her- stating the department was clean.
> When Dorothy pointed out the areas of his dept. needing
> recovery- Daniel continued arguing w/ a member of
> management showing complete disrespect towards Dorothy
> and her position of authority. This type of disrespect
> toward a member of the store Management Team is a blatant
> act of insubordination & against all Company
> Standards/Discipline and can not be allowed. Any further
> violations of company/store policies & standards may lead
> to additional Disciplinary Action up to and including
> Immediate Discharge.

Exhibit 8.[6] This document was faxed to Mr. Bennett before the April 20 meeting with Mr. Orme, but was not given or shown to Mr. Orme. Mr. Kidd testified that he faxed Exhibit 8, the reprimand, to Mr. Bennett on April 19, 2006. Kidd dep. 97:12-98:19. Mr. Kidd testified that had Mr. Orme not filed a complaint, he would not have sent the reprimand to Mr. Bennett. Kidd dep. 98:22-99:4.

After the meeting on April 20, 2006, Mr. Kidd prepared an "Employee Warning," for "Improper Personal Conduct," "Poor Performance," and "Altercation/Fighting." Under the heading "Nature of Violation," Mr. Kidd wrote:

> today 4/20/06 dana bennett (district mgr) and myself
> called daniel orme into the managers office at 3 pm to
> discuss the incident of 4/14/06 involving daniel and dept
> manager dorothy jacobson (sportswear). (documentation
> attached) dana asked daniel to tell his side of the
> situation of that evening. after daniel informed dana of
> his side, dana was explaining what dorthy's and every
> managers responsibility was for store recovery in
> directing all associates in their respective areas; and
> dana was interrupted consistantly by daniel. when dana

---

[6] Spelling, punctuation and abbreviations are as they appear in original document.

FINDINGS AND RECOMMENDATION Page 13

informed daniel from the beginning of the conversation
that he was here to listen to his side, daniel was
persistant in stateing that he could not work with
someone that he does not respect especially one that had
disrespected him, suggesting dorothy made a "racial"
comment by stating "you people"! during their incident!
dana continued to try and explain that daniel's
responsibility was to not argue with dorothy and disagree
with her, but to do what he was told and then take it to
store management. daniel continued to interrupt dana in
a disrespectful manner stating "your here talking to me
disrespecting her [sic]; what have you said to dorthy of
her disrespecting me with a "racial" comment when she
said you people? dana answered by stating his
conversations with dorthy would be of no concern to him[7]
that it would be confidential like this one. daniel
stated once again that he would not work with someone
like dorothy and at that point dana stated there were
conflicting stories of the incident in the documentation
he has read; that dorothy is part of this management in
this store and she will continue being so and if his
predetermined notion was not to listen then dana would
accept daniel's resignation immediately. daniel stated he
was getting his attorney and requested dana write his
full name and dorothy's, at which time dana responded,
"no" that will not happen, and if that is your decision
i will accept your resignation and your attorney can
contact our attorney. daniel said okay, clocked out and
dana informed him that we would put in his hours this
week and his last paycheck should be here monday.

Id. at Exhibit 7. Neither Exhibit 7 nor Exhibit 8 was given to Mr.

Orme. Kidd dep. 126:1-14.

On April 26, 2006, Mr. Kidd prepared another document which

notified Burlington's corporate office of Mr. Orme's termination.

Rosenthal Declaration, Exhibit 10; Kidd dep. 127:13-3-128:3. The

document states that Mr. Orme was terminated on April 26, 2006, for

misconduct. Burlington submitted an Employer's Statement to the

State of Washington which advised that Mr. Orme last worked on

---

[7] I.e., Mr. Orme. Kidd dep. 182:21-183:2. As of April 20,
2006, Mr. Bennett had had no conversations with Ms. Jacobson.
Kidd dep. 183:3-5.

FINDINGS AND RECOMMENDATION Page 14

1  April 20, 2006, and was separated on May 6, 2006, having been

2  discharged for "verbal inappropriate conduct." Rosenthal

3  Declaration, Exhibit 18, p. 1-2.

### Standard

5  A party is entitled to summary judgment if the "pleadings,

6  depositions, answers to interrogatories, and admissions on file,

7  together with affidavits, if any, show there is no genuine issue as

8  to any material fact." Fed. R. Civ. P. 56(c). Summary judgment is

9  not proper if material factual issues exist for trial. Warren v.

10 City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995). A genuine

11 dispute arises "if the evidence is such that a reasonable jury

12 could return a verdict for the nonmoving party." State of

13 California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003). Where

14 the record taken as a whole could not lead a rational trier of fact

15 to find for the non-moving party, there is no genuine issue for

16 trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

17 574, 587 (1986).

18 On a motion for summary judgment, the court must view the

19 evidence in the light most favorable to the non-movant and must

20 draw all reasonable inferences in the non-movant's favor. Clicks

21 Billiards Inc. v. Sixshooters Inc., 251 F.3d 1252, 1257 (9th Cir.

22 2001). The court may not make credibility determinations or weigh

23 the evidence. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S.

24 133, 150 (2000). Where different ultimate inferences may be drawn,

25 summary judgment is inappropriate. Sankovich v. Ins. Co. of N. Am.,

26 638 F.2d 136, 140 (9th Cir. 1981).

28 FINDINGS AND RECOMMENDATION Page 15

**Discussion**

A.    Retaliation

Section 704(a) of Title VII provides that

it shall be an unlawful employment practice for an
employer to discriminate against any of his employees ...
because he has opposed any practice made an unlawful
employment practice by this subchapter.

42 U.S.C. § 2000e-3(a). Among other things, § 704(a) prohibits

employers from retaliating against employees who oppose

discriminatory employment practices.

1.    Elements of prima facie case

To establish a prima facie case of retaliation, the employee

must show that 1) he has engaged in statutorily protected

expression; 2) he has suffered an adverse employment action; and 3)

there is a causal link between the protected expression and the

adverse action. EEOC v. Dinuba Medical Clinic, 222 F.3d 580, 586

(9th Cir. 2000). The definition of "adverse employment action" in

the context of a retaliation claim is different, and broader, than

in the context of a disparate treatment claim. Burlington N. &

Santa Fe Rwy. Co. v. White, 548 U.S. 53 (2006). For purposes of a

retaliation claim, the term "adverse employment action" is not

limited to actions that affect the terms and conditions of

employment; rather, it is an action that might dissuade a

reasonable worker from engaging in protected activity. Id. See also

Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000).

In some cases, causation can be inferred from timing alone

where an adverse employment action follows on the heels of

protected activity, see, e.g., Villiarimo v. Aloha Island Air,

1  Inc., 281 F.3d 1054, 1065 (9th Cir. 2002) and Passantino v. Johnson

2  & Johnson Consumer Prods., Inc., 212 F.3d 493, 507 (9th Cir. 2000),

3  particularly when the adverse action occurs "fairly soon after the

4  employee's protected expression." Villiarimo, 281 F.3d at 1065. See

5  also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273

6  (2001)(cases that accept mere temporal proximity between an

7  employer's knowledge of protected activity and an adverse

8  employment action as sufficient evidence uniformly hold that the

9  temporal proximity must be very close).

10     Burlington asserts that Mr. Orme has failed to establish the

11  elements of protected activity, adverse employment action or causal

12  link.

a.   Protected activity

14     Burlington asserts that where the conduct complained of could

15  not reasonably be considered to have violated Title VII, a

16  complaint about it does not constitute protected activity for

17  purposes of making a retaliation claim, citing a case from the

18  Eastern District of Washington, Daly v. Cazier Enterprises, Inc.,

19  2006 U.S. Dist. LEXIS 80847 (E.D. Wash. 2006)(attached to

20  Supplemental Nelson Declaration as Exhibit 12).

21     Daly was a female college student who worked at a family run

22  Subway sandwich franchise. Her employer, Cazier, became concerned

23  about customer complaints from the store where Daly usually worked,

24  and brought in a new manager. The new manager, Caserez, a woman,

25  held a store wide employee meeting emphasizing the importance of

26  customer service and warned employees that they could lose their

27

28  FINDINGS AND RECOMMENDATION Page 17

1  jobs if the situation did not improve.

2      The next day, Noe Valencia, a Mexican-American supervisor who
3  normally worked at a different location, was on duty at the store
4  where Daly worked. At one point, Daly was in the back of the store
5  and asked Mr. Valencia, "Do you got it [sic] or should I get it?"
6  with regard to a customer. Valencia later told Daly that the way
7  she asked the question, in front of the customer, would make other
8  Mexicans think she did not like her job and was lazy. He advised
9  her to ask her coworkers, "Would you like help?" Soon after this
10 conversation, Daly went to the back of the store to get a bag of
11 mustard. She remarked that the bag she was carrying "feels just
12 like a baby." In response, Valencia asked Daly whether she had any
13 children and whether she was married. She responded that she did
14 not have time for children or marriage as she was in college.
15 Valencia said he was married at 20, and that he knew other people
16 who had children at that age. At some point during the shift Daly
17 told Valencia she was uncomfortable with the questioning. Later
18 that evening, Valencia had a conversation with another Hispanic
19 supervisor, Guadalupe Saenz. Daly, who understands Spanish,
20 overheard Valencia telling Saenz about the conversation he had with
21 Daly about the interaction with the customer, and saying Daly was
22 very lazy.

23     Daly wrote a letter to Cazier complaining about her
24 interactions with Valencia and the conversation between Valencia
25 and Saenz. Crazier investigated the incident and met with Daly.
26 Daly indicated that her coworkers had been harassing her. To Daly,

27

28 FINDINGS AND RECOMMENDATION Page 18

the meeting seemed like an interrogation and Caserez tested Daly's
Spanish. Daly asked not to have to work with Valencia again.
Subsequent to the complaint, Daly's work hours were decreased.
About two weeks later, Daly was terminated. In Cazier's termination
letter, he indicated that Daly's complaint was one factor in his
decision to terminate her.

The court held that Daly could not assert a claim for
retaliation under Title VII because Daly failed to show she had
engaged in statutorily protected activity: her complaint, about a
single incident, was not even arguably based on violation of the
law or conduct that Daly reasonably believed was discriminatory.[8]

The Daly opinion relied on Clark County Sch. Dist. v. Breeden,
532 U.S. 268 (2001)(per curiam). In Breeden, the Supreme Court held
that a plaintiff was precluded from asserting a retaliation claim
based on her internal complaints about an incident of alleged
sexual harassment because no reasonable person could have believed
that the incident violated Title VII.

In Breeden, plaintiff contended that her employer had taken
adverse employment actions against her in response to protected
activities. She alleged that a male supervisor met with plaintiff
and another male employee to review the psychological evaluation
reports of job applicants. The report for one of the applicants

---

[8] The court noted that establishing a retaliation claim
under 42 U.S.C. § 1981 "may be more complicated" than a
retaliation claim under Title VII because "there are no
underlying standards on which to base the determination of
whether the plaintiff engaged in protected activity." 2006 LEXIS
80847 at *14.

FINDINGS AND RECOMMENDATION Page 19

disclosed that the applicant had once commented to a co-worker, "I hear that making love to you is like making love to the Grand Canyon." At the meeting, plaintiff's supervisor read the comment aloud, looked at plaintiff and said, "I don't know what that means." The other male employee then said, "Well, I'll tell you later," and both men chuckled. Plaintiff complained about the episode. Her claim of retaliation asserted that she was punished for these complaints.

The Supreme Court applied the standard used by the Ninth Circuit below, without ruling on the standard itself, that Title VII protects employee opposition "not just to practices that are actually made ... unlawful" by Title VII, but also to practices that the employee could reasonably believe were unlawful. See <u>Trent v. Valley Electric Ass'n Inc.</u>, 41 F.3d 524, 526 (9th Cir. 1994). The Court concluded that no reasonable person could have believed that the single incident complained of by the plaintiff violated Title VII, because the "ordinary terms and conditions of [plaintiff's] job required her to review the sexually explicit statement in the course of screening job applicants," and her co-workers in the hiring process were subject to the same requirement. The Court noted that in the district court, plaintiff "conceded that it did not bother or upset her" to read the statement in the applicant's file. <u>Breeden</u>, 532 U.S. at 271. The Court held that the supervisor's comment, the co-worker's response, and the chuckling of both were at worst an "isolated incident" that could not remotely be considered as serious as the law required.

FINDINGS AND RECOMMENDATION Page 20

1    In <u>Daly</u>, the court applied <u>Breeden</u> to conclude that no
2 reasonable person could believe that Valencia's single comment
3 about Mexicans thinking Daly was lazy, and his discussion that same
4 day with Saenz which Daly overheard, constituted violation of §
5 1981 or created a hostile working environment.

6    Mr. Orme has submitted a case from the Southern District of
7 New York, <u>Watson v. E.S. Sutton, Inc.</u>, 2005 WL 217659 (S.D.N.Y.
8 2005), but that case involves sexual harassment and the holding is
9 specific to the facts.

10    I am unpersuaded that <u>Breeden</u> and <u>Daly</u> defeat Mr. Orme's
11 claim. Ms. Jacobson's comment was ambiguous insofar as "you people"
12 might or might not refer to race. It was not part of Mr. Orme's job
13 duties to review racial comments, as it was plaintiff's job in
14 <u>Breeden</u> to review sexually explicit statements, and unlike the
15 plaintiff in <u>Breeden</u>, who said she was not bothered or upset by the
16 comment, Mr. Orme testified that Ms. Jacobson's comment about "you
17 people" enraged him. A comment made directly to the plaintiff, as
18 here, is different in its impact from a comment appearing in a job
19 applicant's file reacted to by coworkers without reference to
20 plaintiff.

21    In contrast to the <u>Daly</u> case, Ms. Jacobson's comment about
22 "you people" to Mr. Orme, an African-American, could reasonably be
23 interpreted as a racial slur, unlike the comment of Valencia
24 (apparently Mexican himself) about Mexicans thinking Daly, who is
25 not a Mexican, was lazy. A reasonable juror could conclude that Mr.
26 ///

27

28 FINDINGS AND RECOMMENDATION Page 21

1 Orme reasonably believed that Ms. Jacobson's comment to him was
2 racially discriminatory.

3     In its reply brief, Burlington makes an argument based on a
4 different case, Green v. Shoreline Community College, 2006 U.S.
5 Dist. LEXIS 92490 (E.D. Wash. 2006).

6     In that case, plaintiff Riccardo Green, who is Filipino,
7 Mongolian, Jamaican, and Native American, taught tai chi courses at
8 Shoreline. He alleged that he was told by a Shoreline employee,
9 Nickerson, that he could not use computer equipment because the
10 school was closing early. Green asked Nickerson whether she "has a
11 problem with me" and "have you ever heard of racism?" Green alleged
12 that on another occasion, he asked Nickerson for keys to a
13 classroom, and that Nickerson's husband, who was present, told
14 Green to say "please."

15     Green complained about the two incidents to Human Resources
16 and may have made an EEOC complaint, although there was no evidence
17 that the charge was processed or that Shoreline knew of it before
18 the alleged adverse actions taken against Green by the college.

19     Shoreline continued to offer Green's courses through the
20 summer quarter of 2005, but the courses for the winter, spring, and
21 summer quarters of 2005 were cancelled for insufficient enrollment.
22 The evidence showed that enrollment in the class dropped to 3 in
23 winter term of 2005, zero in spring of 2005, and 2 in summer of
24 2005, after previously ranging from 24 to 8. In May 2005, a
25 Caucasian female was hired to teach a different type of tai chi
26 course for the fall quarter of 2005.

27

28 FINDINGS AND RECOMMENDATION Page 22

1    The court held that Green's retaliation claim could not be
2    maintained because his complaints were not protected activity. The
3    court acknowledged that the two incidents with Nickerson might have
4    been subjectively perceived as constituting harassment or
5    discrimination based on race, but that under an objective standard,
6    no reasonable person could believe that the two incidents
7    constituted violations of Title VII by Shoreline.

8    As with <u>Daly</u> and <u>Breeden</u>, I conclude that the <u>Green</u> case is
9    distinguishable from this case, and that Mr. Orme has satisfied the
10   "protected activity" element of his prima facie case.

11            b.    <u>Adverse employment action and causation</u>

12   Burlington contends that Mr. Orme suffered no adverse
13   employment action, because he has not produced any evidence that he
14   was reprimanded for complaining about Dorothy Jacobson's remark, or
15   that he was terminated. Rather, Burlington argues, Mr. Orme was
16   reprimanded for arguing with Ms. Jacobson, and he voluntarily
17   resigned his employment after a "thorough investigation of his
18   complaint showed that his allegations could not be substantiated."
19   Defendant's Memorandum, p. 11.

20   According to Mr. Kidd's testimony, a written reprimand, based
21   on Ms. Jacobson's response to Mr. Orme's complaints, had already
22   been prepared and shown to Mr. Bennett before the April 20, 2006
23   meeting--that is, before Burlington had interviewed Mr. Orme about
24   his complaint. The parties do not dispute that the reprimand would
25   not have been given if Mr. Orme had not complained about Ms.
26   Jacobson.

27

28   FINDINGS AND RECOMMENDATION Page 23

Mr. Kidd did not say in his deposition who was interviewed in the course of his investigation or what was said. But as part of Burlington's reply materials, Mr. Kidd submitted a declaration stating that he interviewed Dorothy Jacobson and three witnesses. Declaration of Jim Kidd ¶ 3. The Declaration states that none of the witnesses he interviewed corroborated Mr. Orme's allegation that Ms. Jacobson had said anything referencing Mr. Orme's race. Id. at ¶ 4.

Mr. Kidd states in his declaration that Ms. Jacobson "complained to me about Mr. Orme's behavior the night of April 14, 2006, providing a written statement that indicated that Mr. Orme argued with her when she told him that his department was not recovered and to get back to work." Id. at ¶ 5. The Jacobson statement itself is attached to Mr. Kidd's declaration as Exhibit 1. In her statement, Ms. Jacobson denied using the "f word" to Mr. Orme and said that she told Mr. Orme he was not doing his job and to recover Linens properly. Ms. Jacobson asserted that Mr. Orme argued with her about whether his department was recovered. Id. In her statement, Ms. Jacobson does not admit or deny that she made a reference to "you people." Id. She states that Mr. Orme told Cecil Cornette he had a sick child and needed to leave, but her statement does not indicate whether she heard what Mr. Orme said to Mr. Cornette or whether she was told by Mr. Cornette. In any event, there is no evidence that Mr. Cornette was asked to corroborate this assertion by Ms. Jacobson.

///

FINDINGS AND RECOMMENDATION Page 24

1    Mr. Kidd's notes reflect that Victoria, a Linens associate,
2 told Mr. Kidd she heard Jacobson and Orme yelling at each other,
3 with Jacobson saying, "You need to work," and Orme saying, "Don't
4 disrespect me." Id. Mr. Kidd also wrote that Victoria had said,
5 "Dorothy has a loud voice and should be more calm when talking to
6 people." Id. Mr. Kidd's notes of the conversation with Victoria
7 neither confirm nor disprove Mr. Orme's complaint about Ms.
8 Jacobson's "you people" remark.

9    Mr. Kidd's notes reflect that someone named Koang in Receiving
10 said he had only heard the yelling, but did not stop to listen to
11 what was said. Id. Again, Mr. Kidd's notes neither confirm nor
12 disprove Mr. Orme's complaint.

13   A written statement by Paul Higley is also attached to Mr.
14 Kidd's declaration. The statement is dated April 15, 2006, the day
15 after the incident with Jacobson. Id. Mr. Higley relates that Mr.
16 Orme came in at 1:30 that day and started talking with Holly, a
17 part time sales associate, about Ms. Jacobson. Mr. Higley said he
18 interrupted the conversation "when it became apparent to me that
19 Daniel was upset," and that Mr. Orme told him Ms. Jacobson had
20 "jumped" him about not recovering the department, when the
21 department was recovered and clean. Id. Mr. Higley said he stopped
22 Mr. Orme and said, "I don't know what happened between you and
23 Dorothy, but this department was not clean or [sic] was it
24 recovered." Id. Mr. Higley took Mr. Orme to bath rugs and showed
25 him the condition of the section as he had found it, but Mr. Orme
26 was "firm in his statement that he did recover that section." Id.

27

28 FINDINGS AND RECOMMENDATION Page 25

Even if this new evidence from Burlington were admissible and timely, Mr. Kidd's notes do not support Burlington's contention that there is no genuine issue of material fact that the witnesses Mr. Kidd interviewed failed to corroborate Mr. Orme's complaint about a racist comment by Ms. Jacobson. The statements by Victoria and Koang neither confirm nor deny Mr. Orme's complaint. Mr. Higley's statement addresses only the question of whether Linens was recovered at the end of the day on April 14, 2006. Mr. Bennett's deposition testimony creates more questions than it resolves.

Mr. Kidd's testimony shows that Mr. Kidd had already prepared a "final warning" for Mr. Orme, based on "insubordination" toward Dorothy Jacobson before Mr. Kidd and Mr. Bennett had even heard Mr. Orme's side of the story. A jury could reasonably find that this "final warning" constituted retaliation for his complaint. As Mr. Orme points out, until Mr. Orme complained to Mr. Kidd about Ms. Jacobson, no reprimand or other discipline was pending against him. The reprimand that Mr. Kidd prepared and presented to Mr. Bennett was prepared after Mr. Orme complained about Ms. Jacobson, and was apparently prepared as a result of Mr. Orme's complaint--there is no indication in the record that the reprimand was the result of a complaint initiated by Ms. Jacobson before Mr. Kidd asked her about Mr. Orme's complaint.

A reasonable jury could also find that if Mr. Orme had not complained about Ms. Jacobson, he would not have been issued the reprimand and would not have been fired on April 20, 2006, during

FINDINGS AND RECOMMENDATION Page 26

1   the meeting with Mr. Bennett that Mr. Orme himself had asked for.

2   I turn now to the question of whether Burlington had

3   legitimate, non-discriminatory reasons to take the actions it did,

4   and whether Mr. Orme has met his burden of showing pretext.

5   B.   Legitimate explanation for employer's conduct

6   The employer can rebut the plaintiff's prima facie case by

7   producing evidence of a legitimate, nondiscriminatory explanation

8   for its actions. St. Mary's Honor Center v. Hicks, 509 U.S. 502,

9   506-07 (1993)(if plaintiff establishes prima facie case, burden of

10  production shifts to employer to articulate a nondiscriminatory

11  reason for adverse employment action, causing the presumption

12  created by the prima facie case to fall away.) The employer must

13  produce evidence, not merely express an argument. Rodriguez v. GMC,

14  904 F.2d 531, 533 (9th Cir. 1990).

15  There is essentially no evidentiary support for Burlington's

16  contentions that 1) Mr. Orme's complaints were unsubstantiated by

17  other witnesses in the course of an investigation conducted by Mr.

18  Kidd, 2) the reprimand prepared by Mr. Kidd before the April 20

19  meeting was prepared for reasons other than Mr. Orme's complaint

20  about Ms. Jacobson's remark, and 3) Mr. Orme voluntarily resigned

21  his position rather than being terminated.

22  C.   Pretext

23  Mr. Orme can establish pretext in two ways:

24  (1) indirectly, by showing that the employer's proffered
    explanation is 'unworthy of credence' because it is
25  internally inconsistent or otherwise not believable, or
    (2) directly, by showing that unlawful discrimination
26  more likely motivated the employer.

27

28  FINDINGS AND RECOMMENDATION Page 27

1  _Chuang_, 225 F.3d at 1127. To survive summary judgment, Mr. Orme is

2  not required to provide direct evidence of discriminatory intent as

3  long as a reasonable factfinder could conclude, based on his prima

4  facie case and the factfinder's disbelief of Burlington's reasons

5  for  discharge,  that  discrimination  was  the  real  reason  for

6  Burlington's actions. _Nidds v. Schindler Elevator Corp._, 113 F.3d

7  912, 918 n. 2 (9th Cir. 1997).

8      Circumstantial evidence must be "specific" and "substantial"

9  to create a triable issue of fact on whether the employer intended

10  to discriminate. _Godwin_, 150 F.3d at 1222.[9] A plaintiff can make a

11  case that an employer is biased by showing the employer's proffered

12  explanation for the adverse action is "unworthy of credence."

13  _Coghlan v. American Seafoods Co. LLC_, 413 F.3d 1090, 1095 (9th Cir.

14  2005)(quoting _Burdine_, 450 U.S. at 256). As the Supreme Court

15  explained in _Reeves v. Sanderson Plumbing Prods., Inc._, 530 U.S.

16  133,  147  (2000),  "Proof  that  the  defendant's  explanation  is

17  unworthy of credence is simply one form of circumstantial evidence

18  that is probative of intentional discrimination, and it may be

19  quite persuasive." In deciding whether judgment as a matter of law

20  is appropriate, the court looks at "the strength of the plaintiff's

21  prima facie case, the probative value of the proof that the

22

23      [9] But see _Cornwell v. Electra Cent. Credit Un._, 439 F.3d
    1018, 1030-31 (9th Cir. 2006) (discussing whether post-_Godwin_
24  cases may have overturned the _Godwin_ requirement that a
    plaintiff's circumstantial evidence of pretext must be "specific
25  and "substantial," but not finally deciding the issue because the
    evidence presented by the plaintiff was sufficient to create a
26  genuine issue of fact regarding the defendant's motive for its
    actions under the _Godwin_ specific and substantial standard in any
27  event).

28  FINDINGS AND RECOMMENDATION Page 28

1   employer's explanation is false, and any other evidence that

2   supports the employer's case." <u>Reeves</u>, 530 U.S. at 148-49.

3       The witness statements proffered by Mr. Kidd do not establish

4   that Mr. Orme's complaint was unsubstantiated. Ms. Jacobson does

5   not address the "you people" remark in her statement, neither

6   confirming nor denying it. The other two witnesses Mr. Kidd

7   interviewed, Victoria and Koang, denied hearing the entire

8   conversation between Ms. Jacobson and Mr. Orme. It is undisputed

9   that Mr. Higley was not in the store on April 14, 2006. There is no

10  statement or other evidence from Mr. Cornette.

11      There is no dispute that the reprimand prepared by Mr. Kidd

12  before the April 20, 2006 meeting would not have been prepared had

13  Mr. Kidd not been investigating Mr. Orme's complaint. There is no

14  evidence that Ms. Jacobson complained about Mr. Orme's

15  argumentativeness or insubordination to her until she was

16  interviewed by Mr. Kidd in connection with Mr. Orme's complaint

17  about her.

18      Burlington's own documentation contains inconsistent

19  statements about whether Mr. Orme resigned or was terminated for

20  misconduct; the record contains two documents prepared by

21  Burlington which state that Mr. Orme was terminated. Mr. Bennett's

22  deposition testimony is contradictory and inconsistent on what was

23  said to Mr. Orme and what Mr. Orme said. Mr. Bennett's testimony is

24  also inconsistent with many of the statements in Mr. Kidd's

25  documentation of the April 20 meeting.

26  ///

27

28  FINDINGS AND RECOMMENDATION Page 29

1    The evidence of pretext is sufficient to enable Mr. Orme to
2    survive summary judgment.

3                          **Recommendation**

4    I recommend that Burlington's motion for summary judgment
5    (doc. # 47) be denied, because Mr. Orme has made out a prima facie
6    case and has also submitted evidence sufficient to overcome
7    Burlington's nondiscriminatory reasons to show pretext.

8                         **Scheduling Order**

9    The above Findings and Recommendation will be referred to a
10   United States District Judge for review. Objections, if any, are
11   due October 14, 2008. If no objections are filed, review of the
12   Findings and Recommendation will go under advisement on that date.
13   If objections are filed, a response to the objections is due
14   October 28, 2008 and the court's review of the Findings and
15   Recommendation will go under advisement with the District Judge on
16   that date.

17   Dated this 29th day of <u>September</u>, 2008.

18

19                              /s/ Dennis James Hubel
                              Dennis James Hubel
20                      United States Magistrate Judge

21

22

23

24

25

26

27

28   FINDINGS AND RECOMMENDATION Page 30